**PUBLISHED**
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-2424**

JULIO ERNESTO MARTINEZ, a/k/a Julio Martinez,

> Petitioner,

> v.

ERIC H. HOLDER, JR., Attorney General,

> Respondent.

-------------------------

AMERICAN IMMIGRATION LAWYERS ASSOCIATION,

> Amicus Supporting Petitioner.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: October 31, 2013          Decided: January 23, 2014

Revised Opinion Filed: January 27, 2014

Before NIEMEYER and WYNN, Circuit Judges, and Louise W. FLANAGAN, United States District Judge for the Eastern District of North Carolina, sitting by designation.

Petition granted in part and denied in part and case remanded for further proceedings by published opinion. Judge Niemeyer wrote the opinion, in which Judge Wynn and Judge Flanagan joined.

**ARGUED:** Maureen A. Sweeney, UNIVERSITY OF MARYLAND CAREY LAW SCHOOL, Baltimore, Maryland, for Petitioner. Oluremi da Rocha-Afodu, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. Benjamin Richard Casper, UNIVERSITY OF MINNESOTA SCHOOL OF LAW, Minneapolis, Minnesota, for Amicus Supporting Petitioner. **ON BRIEF:** Alison D. Yoder, Student Attorney, UNIVERSITY OF MARYLAND CAREY SCHOOL OF LAW, Baltimore, Maryland, for Petitioner. Stuart F. Delery, Acting Assistant Attorney General, Civil Division, Blair T. O'Connor, Assistant Director, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. Andres C. Benach, BENACH RAGLAND L.L.P., Washington, D.C.; Katherine Evans, CASPER & EVANS, P.A., Minneapolis, Minnesota; Samuel Johnson, Student Attorney, Holden Turner, Student Attorney, Interprofessional Center For Counseling & Legal Services, UNIVERSITY OF ST. THOMAS, Minneapolis, Minnesota, for Amicus Supporting Petitioner.

NIEMEYER, Circuit Judge:

Julio Ernesto Martinez, a citizen of El Salvador, who is subject to removal from the United States because he entered without authorization and, while in the United States, was given a judgment of probation before verdict for marijuana possession, requests that the Attorney General withhold removal under 8 U.S.C. § 1231(b)(3), which places restrictions on removal to countries where the alien's life or freedom would be threatened. He claims that as a former member of the violent Mara Salvatrucha gang ("MS-13"), he is a member of a "particular social group," as would qualify for withholding of removal under § 1231(b)(3), and that he would be killed if sent back to El Salvador because he renounced his membership in MS-13. Based on these circumstances, he also requests relief under the Convention Against Torture ("CAT"), contending that the government of El Salvador would acquiesce in his torture at the hands of MS-13.

The immigration judge ("IJ") and the Board of Immigration Appeals ("BIA") rejected Martinez's arguments, concluding that being a "former member[] of a gang in El Salvador" is not an "immutable characteristic" of a particular social group that could qualify for withholding of removal, since the characteristic "result[ed] from the voluntary association with a criminal gang." The IJ and the BIA also found that Martinez's

3

claim for relief under the CAT was not supported by sufficient evidence.

We conclude that Martinez's proposed particular social group of former MS-13 members from El Salvador is immutable for withholding of removal purposes in that the only way that Martinez could change his membership in the group would be to rejoin MS-13. We hold therefore that the BIA erred in its ruling declining -- on immutability grounds -- to recognize the particular social group of former members of MS-13 who have renounced their membership in the gang. Accordingly, we reverse that ruling on immutability and remand Martinez's application for withholding of removal to permit the BIA to consider whether Martinez's proposed social group satisfies the other requirements for withholding of removal. On Martinez's application for protection under the CAT, we affirm. Despite Martinez's claim to the contrary, we conclude that the IJ and the BIA sufficiently considered the relevant evidence.

I

Martinez was born in San Miguel, El Salvador, in 1980 and lived there until he entered the United States unlawfully in 2000.

In March 2006, when Martinez was stopped while driving his friend's car with a malfunctioning brake light, the police found

4

a marijuana blunt in a dashboard compartment of the car. Although Martinez denied any connection with the marijuana, he pleaded to probation before judgment in December 2007.

Even before Martinez's marijuana charge was resolved, the Department of Homeland Security had initiated removal proceedings against him based on his illegal entry. It subsequently closed the proceedings because Martinez agreed to serve as a confidential informant, assisting the FBI in making controlled purchases of drugs and fake green cards. When Martinez was stopped again in May 2011 for a traffic offense, the Department of Homeland Security recalendared the removal proceedings, concluding that Martinez was "no longer useful as a confidential informant." In the reopened proceedings, the government added a charge that Martinez was subject to removal as an alien convicted of a controlled substance offense. Martinez conceded that he was subject to removal, but he sought relief from removal on the ground that his life would be endangered should he be returned to El Salvador.

At the hearing before the IJ, Martinez testified that his stepfather died when he was 12 years old and that, at the age of 14, he befriended a group of older boys who had also lost family members. The group went to parties, drank, and smoked marijuana together. Martinez later learned, however, that some of the boys who had recruited him into this group were also associated

5

with MS-13, although the group itself had no association with that gang. This status changed, however, when several members of MS-13 were deported from the United States and arrived in Martinez's neighborhood. Martinez's group was then "incorporated" into the larger MS-13 gang structure, which, to some extent, was involuntary. Martinez testified that the new MS-13 arrivals informed him and his friends that they were "already . . . part of MS-13" and that they had no option but to join the gang. Martinez, who was now 15, agreed to undergo MS-13's initiation rite of a beating that lasts 13 seconds.

Soon after Martinez's induction into MS-13, the deportees killed the original leaders of Martinez's group of friends and became the gang's new leaders. They ordered Martinez to get tattoos signifying his allegiance to MS-13, which he did. They also ordered him to extort money from members of the community, which he refused to do. Because of his disobedience, the leaders of the gang beat Martinez on a weekly basis. Martinez testified that he never "committed any crimes for the gang," although he conceded that he did participate once in the beating of a fellow gang member for failing to follow orders. Thereafter, however, he also refused to join in those disciplinary beatings, which consequently subjected him to further beatings.

6

MS-13 held weekly meetings for members in the local community and monthly general meetings, which were attended by thousands of members from across El Salvador. Martinez attended most of these meetings, and he was beaten when he did not attend. At the meetings, the leaders would discuss who was part of the gang and who was not. They also informed the membership as to who had the "green light," which indicated that the member was to be executed. A principal reason for receiving the green light was attempting to leave MS-13. Indeed, two of Martinez's friends who attempted to leave the gang were killed.

By the time Martinez reached the age of 16, he became "tired of [the] beatings" that he had been receiving for refusing to obey the leaders, and he decided to leave MS-13. Accordingly, he stopped attending its meetings. Several weeks later, he encountered his local group leader, "Psycho," who asked him where he had been. When Martinez told Psycho that he wanted to leave the gang, Psycho responded that there was "only one way to get out," implying by death. When Martinez nonetheless insisted that he was quitting, gang members beat him and stabbed him, leaving him for dead. Martinez survived, however, and, after leaving the hospital, went to live with a cousin in Intipucá, which is about an hour's drive south of San Miguel.

In Intipucá, Martinez covered his tattoos and left his house only to go to work. Two months later, however, MS-13 members found him and shot at him from a car. Multiple bullet fragments struck Martinez, and he was again hospitalized for several weeks. After recovering, Martinez went into hiding with friends and family members.

MS-13 members once again found Martinez and once again shot at him. This time he managed to escape without injury. Martinez left El Salvador to come to the United States in 2000, entering without permission. He believes that if he were to return to El Salvador, MS-13 members would kill him. Indeed, he claims that while he has been in the United States, he has refrained from going places where he might meet an MS-13 member, such as Spanish nightclubs.

Based on his fear of bodily harm at the hands of MS-13, Martinez sought several forms of relief from removal. He argued that under 8 U.S.C. § 1231(b)(3), he was eligible for withholding of removal because his life was threatened on account of his membership in the particular social group of former gang members from El Salvador. He also argued that he qualified for protection under the CAT because the Salvadoran government would acquiesce in his torture should he be removed. In addition, he applied for temporary protected status. Finally, as an alternative, he requested voluntary departure.

Following a hearing, the IJ found Martinez credible but nonetheless denied him all relief except for his application for voluntary departure. On appeal, the BIA, in a single-member opinion, also rejected Martinez's request for relief. With respect to his § 1231(b)(3) claim, the BIA defined Martinez's proposed social group as "former members of a gang in El Salvador" and concluded that Martinez had not shown that this group had a "common, immutable characteristic" because the "characteristic result[ed] from the voluntary association with a criminal gang." The BIA also affirmed the IJ's conclusion that Martinez had not demonstrated that the Salvadoran government would acquiesce in his torture.

From the BIA's final order of removal dated October 24, 2012, Martinez filed this petition for review.

II

"The courts of appeals are granted jurisdiction to review final orders of removal, 8 U.S.C. § 1252(a)(1), and final orders in cases such as the one before us are generally made by the BIA following appeal from the decision of the IJ." Camara v. Ashcroft, 378 F.3d 361, 366 (4th Cir. 2004); accord Huaman-Cornelio v. BIA, 979 F.2d 995, 999 (4th Cir. 1992). Situations may arise when it is appropriate for this Court to review an IJ's opinion, such as when the BIA adopts the IJ's decision

9

without an opinion of its own, see Camara, 378 F.3d at 366, or when the BIA adopts the IJ's opinion and supplements it with additional reasoning, see Barahona v. Holder, 691 F.3d 349, 353 (4th Cir. 2012). In both such cases, the BIA has determined that the IJ's opinion will become -- in whole or in part -- the final order of removal subject to review.

In this case, however, the BIA issued its own opinion without adopting the IJ's opinion. The BIA's decision, therefore, constitutes the final order of removal, and accordingly we review that opinion and not the opinion of the IJ.[1]

---

[1] This Court has recently purported to review the decisions of both the IJ and the BIA whenever they both issue opinions. See, e.g., Singh v. Holder, 699 F.3d 321, 327 (4th Cir. 2012) ("When, as here, the Board and an IJ issue decisions in a case, we review both on appeal"); Kourouma v. Holder, 588 F.3d 234, 239-40 (4th Cir. 2009) ("When the BIA and the immigration judge both issue decisions in a case, we review both decisions upon appeal"). We take those cases, however, to involve BIA decisions that incorporated some part of the IJ's opinion as part of the BIA's final order. See Camara, 378 F.3d at 366; Huaman-Cornelio, 979 F.2d at 999 ("As a court of appeals, we review only the findings and order of the BIA, not those of the IJ. Section 106(a) of the Immigration and Nationality Act vests us only with the jurisdiction to review 'final orders of deportation.' Final orders are entered only after all administrative remedies have been exhausted; thus final orders in deportation proceedings come from the BIA, the highest administrative tribunal" (citation omitted)). Otherwise, they would conflict with 8 U.S.C. § 1252(a)(1), which provides that we may only review a "final order of removal." An alien facing removal may appeal to the BIA as of right. 8 C.F.R. §§ 1003.1(b)(3), 1003.38(a), 1240.15. The BIA reviews the IJ's legal conclusions de novo and its factual conclusions for clear

10

Martinez's particular challenge to the BIA's opinion in this case is directed against the BIA's determination that, for purposes of § 1231(b)(3), "former members of a gang in El Salvador" are not a "particular social group" as that term is used in the statute, because members of the group do not have "a common, immutable characteristic where that characteristic results from voluntary association with a criminal gang." The parties agree that this presents us with a question of law.

We review the BIA's legal determinations, including its interpretation of the INA and any attendant regulations, de novo. See Li Fang Lin v. Mukasey, 517 F.3d 685, 691-92 (4th Cir. 2008). But in conducting our review, we generally give Chevron deference to the BIA's statutory interpretations, recognizing that Congress conferred on the BIA decisionmaking

error. Id. § 1003.1(d)(3). As such, "there is no 'final order' until the Board acts." Cruz-Funez v. Gonzales, 406 F.3d 1187, 1190 (10th Cir. 2005). Thus, where the BIA issues an opinion without adopting the IJ's opinion in whole or in part, this Court can only review the BIA's opinion. Every other circuit has come to the same conclusion. Romilus v. Ashcroft, 385 F.3d 1, 5 (1st Cir. 2004); Yan Chen v. Gonzales, 417 F.3d 268, 271 (2d Cir. 2005); Brandao v. Att'y Gen., 654 F.3d 427, 429 n.4 (3d Cir. 2011); Mikhael v. INS, 115 F.3d 299, 302 (5th Cir. 1997); Morgan v. Keisler, 507 F.3d 1053, 1057 (6th Cir. 2007); Begzatowski v. INS, 278 F.3d 665, 669 n.5 (7th Cir. 2002); Aung Si Thu v. Holder, 596 F.3d 994, 998 (8th Cir. 2010); Hosseini v. Gonzales, 471 F.3d 953, 957 (9th Cir. 2006); Uanreroro v. Gonzales, 443 F.3d 1197, 1203-04 (10th Cir. 2006); Rodriguez v. U.S. Att'y Gen., 735 F.3d 1302 (11th Cir. 2013) (per curiam); Gutierrez-Rogue v. INS, 954 F.2d 769, 772 (D.C. Cir. 1992).

11

power to decide such questions of law. See INS v. Aguirre-Aguirre, 526 U.S. 415, 424 (1999); Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984). This is true even when the BIA "gives ambiguous statutory terms 'concrete meaning through a process of case-by-case adjudication.'" Aguirre-Aguirre, 526 U.S. at 425 (quoting INS v. Cardoza-Fonseca, 480 U.S. 421, 448 (1987)). Chevron deference, however, is accorded only when an "agency's interpretation is rendered in the exercise of [its] authority [to make rules carrying the force of law]." A.T. Massey Coal Co. v. Barnhart, 472 F.3d 148, 166 (4th Cir. 2006) (citing United States v. Mead Corp., 533 U.S. 218, 226-27 (2001)). If not, then the interpretation is "beyond the Chevron pale." Mead, 533 U.S. at 234.

Because the decision in this case was issued by a single BIA member, it does not constitute a precedential opinion, as a precedential opinion may only be issued by a three-member panel. See 8 C.F.R. § 1003.1(g) ("By majority vote of the permanent Board members, selected decisions of the Board rendered by a three-member panel or by the Board en banc may be designated to serve as precedents in all proceedings involving the same issue or issues" (emphasis added)); see also id. § 1003.1(e)(6) ("Cases may only be assigned for review by a three-member panel if the case presents one of these circumstances . . . (ii) the

12

need to establish precedent construing the meaning of laws, regulations, or procedures . . .").  When issuing a single-member, nonprecedential opinion, the BIA is not exercising its authority to make a rule carrying the force of law, and thus the opinion is not entitled to Chevron deference.  Accord Arobelidze v. Holder, 653 F.3d 513, 520 (7th Cir. 2011); Carpio v. Holder, 592 F.3d 1091, 1097 (10th Cir. 2010); Quinchia v. U.S. Att'y Gen., 552 F.3d 1255, 1258 (11th Cir. 2008); Rotimi v. Gonzales, 473 F.3d 55, 57 (2d Cir. 2007); Garcia-Quintero v. Gonzales, 455 F.3d 1006, 1012 (9th Cir. 2006); see also De Leon-Ochoa v. Att'y Gen., 622 F.3d 341, 350 (3d Cir. 2010) (agreeing with the Ninth Circuit that precedential value is the key determinant in whether an agency decision is accorded Chevron deference).  Therefore, the BIA's interpretation of § 1231(b)(3) in the case before us is not entitled to Chevron deference.

That is not to say that we will not accord the BIA's opinion any consideration.  Even in the absence of Chevron deference, we have concluded that we can rely on the agency's opinions as a "body of experience and informed judgment" to which we may "properly resort for guidance."  A.T. Massey Coal, 472 F.3d at 168 (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).  But even that modest deference depends upon "the thoroughness evident in [the BIA's] consideration, the validity of its reasoning, its consistency with earlier and later

13

pronouncements, and all those factors which give it power to persuade." Id. (quoting Skidmore, 323 U.S. at 140).

                                    III

While Martinez agrees that his circumstances subject him to an order of removal, he claims that the BIA erred in denying him relief under § 1231(b)(3)(A), which provides in relevant part that the Attorney General may not remove an alien, even though otherwise removable, "if the Attorney General decides that the alien's life or freedom would be threatened in [the country of removal] because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A) (emphasis added); see also Camara, 378 F.3d at 367.[2]  The statute does not define "particular social group," and there is little legislative history on the matter. See Fatin v. INS, 12 F.3d 1233, 1239 (3d Cir. 1993).  The BIA has, however, defined "particular social group" as a group meeting three criteria:  "(1) its members share common,

_____

[2] This exception to removal is limited, however, and the alien may nonetheless be removed if (1) he engaged in persecution on account of an individual's "race, religion, nationality, membership in a particular social group, or political opinion"; (2) he has been convicted of a "particularly serious crime" in the United States and is a "danger to the community"; (3) "there are serious reasons to believe [he] committed a serious nonpolitical crime outside the United States"; or (4) "there are reasonable grounds to believe that [he] is a danger to the security of the United States."  8 U.S.C. § 1231(b)(3)(B).

14

immutable characteristics, (2) the common characteristics give its members social visibility, and (3) the group is defined with sufficient particularity to delimit its membership."  Lizama v. Holder, 629 F.3d 440, 447 (4th Cir. 2011) (emphasis added). While we have endorsed both the immutability and particularity criteria, see id. (affirming under both of these criteria), we have explicitly declined to determine whether the social visibility criterion is a reasonable interpretation of the INA, see Zelaya v. Holder, 668 F.3d 159, 165 n.4 (4th Cir. 2012), although we have reviewed the BIA's application of this criterion, see Temu v. Holder, __ F.3d __, No. 13-1192, 2014 WL 169932 (4th Cir. Jan. 16, 2014).

To meet the "immutability" criterion -- the only one at issue in this petition for review -- members of a particular social group must share a characteristic that they "either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." Zelaya, 668 F.3d at 165 (quoting In re Acosta, 19 I. & N. Dec. 211, 233 (B.I.A. 1985), overruled in part on other grounds by In re Mogharrabi, 19 I. & N. Dec. 439 (B.I.A. 1987)) (internal quotation mark omitted).  The BIA has explained that "[t]he shared characteristic might be an innate one such as sex, color, or kinship ties, or in some circumstances it might be a shared

15

past experience such as former military leadership or land ownership." Acosta, 19 I. & N. Dec. at 233 (emphasis added).

Martinez contends that his proposed group of "former members of a gang in El Salvador" meets the immutability requirement because he cannot change his status as a former gang member except by rejoining MS-13, which he claims would violate fundamental precepts of his conscience.

Neither the BIA nor the government seriously contests Martinez's argument that he cannot change his status as a former gang member. Rather, the BIA held that Martinez failed to show that he was "a member of a group with a common, immutable characteristic where that characteristic results from the voluntary association with a criminal gang." (Emphasis added). And the government amplifies this position, asserting that "past 'antisocial' behavior is not an attribute or shared experience that warrants protection under this country's refugee laws."

At the outset, we agree that Martinez's membership in a group that constitutes former MS-13 members is immutable. See Acosta, 19 I. & N. Dec. at 233 (listing "former military leadership" as a prototypical particular social group); Gatimi v. Holder, 578 F.3d 611, 615 (7th Cir. 2009) (former member of a violent political group); Lukwago v. Ashcroft, 329 F.3d 157, 178 (3d Cir. 2003) (former child soldier). Martinez has presented extensive evidence that violence and criminality pervade MS-13,

16

and we conclude, as has the Seventh Circuit, that it would be "perverse" to interpret the INA to force individuals to rejoin such gangs to avoid persecution. See Ramos v. Holder, 589 F.3d 426, 430 (7th Cir. 2009); see also Urbina-Mejia v. Holder, 597 F.3d 360, 366 (6th Cir. 2010) (holding that former gang membership is an immutable characteristic).[3]

The government argues that the INA disqualifies groups whose members had formerly participated in antisocial or criminal conduct. Attaching this condition to qualification as

---

[3] While the First Circuit has recently held that former gang members are not a cognizable particular social group under § 1231(b)(3), see Cantarero v. Holder, 734 F.3d 82, 85-87 (1st Cir. 2013), we do not find its reasoning persuasive here. First, Cantarero is distinguishable from the present case inasmuch as the court there applied Chevron deference to the BIA's decision and thus only determined that the BIA's interpretation of the INA was not "unreasonable or impermissible." Id. at 85-86. Second, as we explain below, we are not persuaded by Cantarero's proposition that "Congress did not mean to grant asylum to those whose association with a criminal syndicate has caused them to run into danger." Id. at 86. Congress was explicit in outlining the transgressions that could disqualify an alien from withholding of removal protection, see § 1231(b)(3)(B), and "associat[ing] with a criminal syndicate" is not on that list. Third, we are dubious of the Cantarero court's dire prediction that our holding today will "offer an incentive for aliens to join gangs here as a path to legal status." 734 F.3d at 86. For this trick to work, the alien would need to join a criminal gang, abandon it, and then persuade the IJ that his "life . . . would be threatened" as a result should he be removed. 8 U.S.C. § 1231(b)(3)(A). The facts of the present case illustrate the horrors gang members face when they turn their backs on their comrades. We doubt that many aliens would risk their lives in this manner, and we are confident in the ability of immigration judges to ferret out charlatans who feign such danger.

17

a "particular social group," however, is untenable as a matter of statutory interpretation and logic.

First, nothing in the statute suggests that persons categorically cannot be members of a cognizable "particular social group" because they have previously participated in antisocial or criminal conduct. Rather, Congress has identified only a subset of antisocial conduct that would bar eligible aliens from withholding of removal, defined by the alien's engaging in past persecution, committing a particularly serious crime, or presenting a danger to the security of the United States. See 8 U.S.C. § 1231(b)(3)(B). But Congress "has said nothing about barring former gang members." See Ramos, 589 F.3d at 430.

Moreover, in arguing for its interpretation that a particular social group may not include members who engaged in past antisocial or criminal conduct, the government focuses on the former status of membership in a gang, failing to recognize a distinct current status of membership in a group defined by gang apostasy and opposition to violence. For support, the government relies heavily on the decision in Arteaga v. Mukasey, 511 F.3d 940 (9th Cir. 2007), as did the BIA. That case, however, is materially distinguishable inasmuch as it affirmed the BIA's denial of withholding of removal from an alien who was "still a gang member," albeit no longer "active." Id. at 945.

18

The court noted that gang membership should not be protected if the alien's shared past experience as a member of the gang "includes violent criminal activity." Id. The court continued, "We cannot conclude that Congress, in offering refugee protection for individuals facing potential persecution through social group status, intended to include violent street gangs who assault people and who traffic in drugs and commit theft." Id. at 945-46.

We agree that current gang membership does not qualify as an immutable characteristic of a particular social group to support withholding of removal under § 1231(b)(3). It is not the case that current gang members "cannot change" their status as gang members, as they can leave the gang. Acosta, 19 I. & N. Dec. at 233. Nor do we think that they "should not be required to change because [gang membership] is fundamental to their individual identities or consciences." Id. To so hold would "pervert the manifest humanitarian purpose of the statute." Arteaga, 511 F.3d at 946.

But Martinez is not a current gang member. Rather, the social group he has identified is defined by rejection of gang membership and its attendant violence. Martinez asserts that his repudiation of gang membership, along with its violence and criminality, is a critical aspect of his conscience that he should not be forced to change. We agree.

19

The BIA alternatively, albeit briefly, justified its rejection of Martinez's claim for withholding of removal on the ground that the threats to his life were only an aspect of internal gang discipline, citing In re McMullen, 19 I. & N. Dec. 90 (B.I.A. 1984). McMullen was a member of the Provisional Irish Republican Army ("PIRA"), and, while a member, he refused to carry out a kidnapping job because he feared that the job would not be successful. Id. at 94. He claimed that his refusal to participate in the operation constituted a political opinion for which the PIRA would persecute him if he returned to Ireland. Id. The BIA found that McMullen's refusal to commit the kidnapping for fear of being caught "does not constitute [a] political opinion." Id. at 95. And it noted that the "internal use of violence by the PIRA does not constitute persecution . . . . Having elected to participate in the PIRA, with knowledge of its internal disciplinary policies, [McMullen] is not now in a position to complain." Id.

The BIA's reliance on In re McMullen in this case was misplaced in that McMullen was still a member of the PIRA, and his fears arose from a disagreement over the wisdom of a particular criminal endeavor. In rejecting his claim, the BIA emphasized that McMullen had assumed this danger as a risk inherent in membership when he joined the PIRA. Martinez, on the other hand, withdrew from the MS-13 gang; he rejected the

20

organization, its violence, and its purposes. He is being targeted because of his membership in the group of former members of MS-13, and the danger he faces is based on his rejection of gang membership. See In re C-A, 23 I. & N. Dec. 951, 958-59 (B.I.A. 2006) (distinguishing between threats that inhere as a part of one's profession and persecution as a result of being a former member of that profession).

Accordingly, we conclude that the BIA erred as a matter of law in its interpretation of the phrase "particular social group" by holding that former gang membership is not an immutable characteristic of a particular social group for purposes of § 1231(b)(3).

Because we only reach the "immutability" criterion and do not address any other criteria that might be applicable, we remand Martinez's withholding of removal claim under § 1231(b)(3)(A) for further proceedings consistent with this opinion.[4]

---

[4] While the "particularity" criterion remains an open question for resolution on remand, we note that the Seventh Circuit in Ramos, 589 F.3d at 431, did distinguish the particularity of the class of inactive gang members at issue in Arteaga from the class of former gang members that it was considering. We also note that we have yet to affirm the statutory authority for the "social visibility" criterion. See Zelaya, 668 F.3d at 165 n.4; cf. Temu v. Holder, __ F.3d __, No. 13-1192, 2014 WL 169932, at *4-6 (4th Cir. Jan. 16, 2014) (finding that the BIA had applied the "social visibility" criterion too restrictively). Assuming without deciding that it

21

Martinez also contends that he was erroneously denied protection under the CAT because, if he were returned to El Salvador, "the Salvadoran police [would] likely acquiesce in or turn a willfully blind eye to the threat that [he would] be tortured." He argues that the BIA ignored relevant evidence that supports his application for CAT protection -- in particular, the evidence that "the police do not take seriously what they perceive as gang-on-gang violence" and the evidence that he "feared reporting the [gang] attacks to police."

"To warrant CAT protection, an alien must prove, first, that it is more likely than not that he will be tortured if removed to the proposed country of removal and, second, that this torture will occur at the hands of government or with the

---

is valid, however, we note that the BIA did not consider that issue at all and the IJ failed to provide a sufficient explanation for why the group of former gang members is insufficiently socially visible for § 1231(b)(3) purposes. See SEC v. Chenery Corp., 318 U.S. 80, 94 (1943) ("[T]he process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained"). The only relevant case cited by the IJ, In re S-E-G-, 24 I. & N. Dec. 579, 582 (B.I.A. 2008), concerned non-gang members who resisted gang recruitment efforts. In the present case, there was evidence that MS-13 held meetings in which the leadership listed individuals who had the "green light" for leaving the gang. On remand, the BIA should, if it applies this criterion, explain why such evidence does not distinguish the present case from the facts of In re S-E-G-.

consent or acquiescence of government." Turkson v. Holder, 667 F.3d 523, 526 (4th Cir. 2012) (emphasis added) (citing 8 C.F.R. § 1208.16(c)(2)). "Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 1208.18(a)(7).

In this case, the IJ concluded that Martinez had not made the necessary showing, finding that because Martinez "never reported the shooting or other threats to his life to the police in El Salvador" and because "country condition information reflects that government officials in El Salvador are taking some steps to address the difficult problem of gang violence there," he failed to show that the Salvadoran government would acquiesce in his future torture. The BIA affirmed on similar grounds, holding that "respondent cannot complain that the Government did not prosecute his attackers because he never made a report" and noting that the "Government of El Salvador has made attempts to reduce or control gang activity," citing several reports about country conditions in El Salvador.

We presume that, in reaching these conclusions, the IJ and the BIA reviewed the evidence presented to them and made their decisions based on the relevant evidence. See Larita-Martinez v. INS, 220 F.3d 1092, 1095-96 (9th Cir. 2000) ("[A]n alien

23

attempting to establish that the Board violated his right to due process by failing to consider relevant evidence must overcome the presumption that it did review the evidence"); Man v. INS, 69 F.3d 835, 838 (7th Cir. 1995) ("[A]bsent evidence to the contrary, we assume that the BIA reviewed the specific findings of the immigration judge in light of the record").

Martinez's claim that the BIA ignored "the extensive country conditions evidence in the record" is simply not supported by the record. In the first instance, the IJ recognized that "[Martinez] th[ought] that government officials in El Salvador would look at him as if he still belonged to the gang." She also made note of the "prevalence of gang violence in El Salvador" and that "country condition information reflects that government officials in El Salvador are taking some steps to address the difficult problem of gang violence there." The BIA similarly noted that El Salvador has attempted to control gang violence, even citing the very reports that Martinez now claims the BIA ignored. It is apparent that the IJ and the BIA reviewed the relevant evidence before them. Accordingly, we affirm the BIA's decision to deny relief under the CAT.

PETITION FOR REVIEW GRANTED IN PART AND DENIED IN PART; REMANDED FOR FURTHER PROCEEDINGS

24