**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 16-2330**

─────────────

JAIRO FERINO SANCHEZ,

　　　　　Petitioner,

　　　v.

JEFFERSON B. SESSIONS III, Attorney General,

　　　　　Respondent.

---------------------------------------------------------

ACLU OF MARYLAND; AMERICAN IMMIGRATION COUNCIL; NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD,

　　　　　Amici Supporting Petitioner.

─────────────

On Petition for Review of an Order of the Board of Immigration Appeals.

─────────────

Argued: January 25, 2018　　　　　　　　　Decided: March 27, 2018

─────────────

Before MOTZ and DIAZ, Circuit Judges, and Robert J. CONRAD, Jr., United States District Judge for the Western District of North Carolina, sitting by designation.

─────────────

Petition denied by published opinion. Judge Motz wrote the opinion, in which Judge Diaz and Judge Conrad joined.

─────────────

**ARGUED:** Barry Dalin, UNIVERSITY OF MARYLAND FRANCIS KING CAREY SCHOOL OF LAW, Baltimore, Maryland, for Petitioner. Kohsei Ugumori, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. Matthew E. Price, JENNER & BLOCK, LLP, Washington, D.C., for Amicus American Immigration Council. **ON BRIEF:** Maureen A. Sweeney, Supervising Attorney, Adilina Malavé, Third Year Law Student, Anne Brenner, Third Year Law Student, University of Maryland Carey Immigration Clinic, UNIVERSITY OF MARYLAND FRANCIS KING CAREY SCHOOL OF LAW, Baltimore, Maryland, for Petitioner. Chad A. Readler, Acting Assistant Attorney General, Emily Anne Radford, Assistant Director, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. Sejal Zota, NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD, Boston, Massachusetts, for Amicus National Immigration Project of the National Lawyers Guild. Deborah A. Jeon, Nicholas Steiner, AMERICAN CIVIL LIBERTIES UNION OF MARYLAND, Baltimore, Maryland, for Amicus ACLU of Maryland. Melissa Crow, AMERICAN IMMIGRATION COUNCIL, Washington, D.C., for Amicus American Immigration Council.

———————————

DIANA GRIBBON MOTZ, Circuit Judge:

After questioning Jairo Ferino Sanchez and learning that he had entered the country illegally, state police officers detained and then transported him to Immigration and Customs Enforcement ("ICE"). An Immigration Judge ("IJ"), in a decision affirmed by the Board of Immigration Appeals ("BIA"), rejected Sanchez's motion to suppress the statements he made to the state officers and ICE, and ordered his voluntary departure. Sanchez now petitions for review. For the reasons that follow, we must deny that petition.

I.

A.

On May 22, 2009, Maryland Transportation Authority Police ("MdTAP") Officer Acker stopped Jose Alberto Badillo Taylor ("Badillo") for a traffic violation. Badillo failed to produce a valid license and Officer Acker noticed that the car had exposed ignition wiring and lacked a steering column, indicating that perhaps it had been stolen. When Badillo explained that the car, a Nissan, belonged to a friend, Officer Acker directed Badillo to call the Nissan's owner, Juventino Tenorio Davila ("Tenorio"), to retrieve his car from the scene. At the time Tenorio received Badillo's call, he was traveling in an Acura with Sanchez and another passenger, Seltik Ferino Sanchez ("Ferino"). Sanchez agreed to drive Tenorio and Ferino to Badillo's location to retrieve the Nissan.

3

When the three men arrived on the scene, Sanchez parked the Acura about twenty to thirty feet in front of the Nissan. Sanchez, Tenorio, and Ferino remained inside the Acura with the engine running. After approximately five minutes, Officer Acker approached the Acura, leaned inside the front passenger window, and asked the men whether they were "illegal or legal." Officer Acker repeated the question two or three times. The Officer later explained that because he believed the men had acted in a "suspicious" manner, when they refused to answer his questions, he spoke to them in an "authoritative" tone.

According to Sanchez, the questioning made him "scared and nervous." Because he "felt pressured and intimidated," he answered the Officer's question and admitted that he had entered the country illegally. At that point, Officer Acker stopped questioning the men and asked Sanchez to turn off the ignition and give him the keys. Sanchez complied. Upon the Officer's request, all three men produced identification cards. With the assistance of another MdTAP officer, Officer Acker then handcuffed the three men.

MdTAP officers transported Sanchez, Tenorio, Ferino, and Badillo to the MdTAP station. At the station, MdTAP officers removed the handcuffs and placed the men in a small cell. After about 90 minutes, Officer Acker returned, re-handcuffed the men, and explained that he was taking them to the ICE facility.[1] In total, MdTAP officers detained Sanchez for approximately three-and-a-half hours.

---

[1] MdTAP officers contacted ICE to request that ICE take custody of the men, but ICE needed approximately five hours to respond to that request. Rather than wait for ICE to come to the MdTAP facility, the MdTAP officers elected to transport the men to ICE.

While in ICE custody, an ICE agent interviewed Sanchez, who again admitted that he had entered the United States illegally without inspection. The agent memorialized Sanchez's admissions to Officer Acker and ICE about his immigration status in a Form I–213 (Record of Deportable/Inadmissible Alien). That form also identifies Sanchez as "a native and citizen of Mexico who entered the United States" in "February 2000 without inspection by an Immigration Officer."

Based on the form, ICE instituted removal proceedings against Sanchez pursuant to Section 212(a)(6)(A)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(6)(A)(1) (2006). Sanchez moved the IJ to suppress all evidence of his illegal entry, including the Form I–213. He maintained that the state police officers obtained this information in violation of his Fourth and Fifth Amendment rights.

In support of his contentions, Sanchez provided affidavits from himself, Tenorio, Ferino, and Badillo. Sanchez also offered an affidavit from Major Stanford O'Neill Franklin, the Executive Director of Law Enforcement Against Prohibition and a former member of the Maryland State Police and MdTAP. In addition, the IJ heard testimony from Sanchez, Officer Acker, Major Franklin, and ICE's expert witness (a Maryland sheriff and former MdTAP officer).

The IJ found that Sanchez "testified credibly in terms of what happened" during the May 2009 traffic stop. He also concluded that Officer Acker treated Sanchez "and his friends . . . pretty much in the manner" Sanchez described, in that Officer Acker inquired "about who they are, where they are from," and asked them "to produce identification."

5

But the IJ was not persuaded that the state officers "intimidated and frightened" Sanchez into giving "up information regarding his Immigration status." The IJ therefore concluded that the record lacked "'specific and detailed statements from which [the IJ] could find evidence" that the MdTAP officers had engaged in "coercion or duress." As a result, the IJ concluded that Sanchez had "failed to demonstrate any violation of the Fifth Amendment that can provide the basis for suppression of evidence." The IJ also found that even if "the MdTAP officers did violate [Sanchez's] Fourth Amendment rights, the presumed violation" was not "egregious."

On appeal before the BIA, Sanchez argued that the IJ applied the incorrect legal standard to his Fourth Amendment claim. The IJ had determined not to suppress Sanchez's statements because any violation of Sanchez's Fourth Amendment right was not "egregious" under *INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984), and *Yanez-Marquez v. Lynch*, 789 F.3d 434 (4th Cir. 2015). Sanchez claimed that the IJ should have instead applied "the full exclusionary rule" and that under that standard, the IJ should have suppressed his statements. Alternatively, Sanchez maintained that, contrary to the IJ's conclusion, he had "suffered an egregious violation of his Fourth Amendment rights." Sanchez also argued that the IJ erred in finding that the officers did not violate his Fifth Amendment right to due process.

The BIA affirmed. It rejected Sanchez's claim that the IJ "should have applied the full exclusionary rule." Instead, the BIA held that in the context before it the exclusionary rule requires proof of an "egregious" Fourth Amendment violation. The BIA found that the IJ had correctly determined that Sanchez failed to establish "an

6

egregious violation of his Fourth Amendment rights." In addition, the BIA agreed that Sanchez had failed to prove that any MdTAP officer had violated Sanchez's due process right. Sanchez noted a timely appeal.[2]

## II.

The exclusionary rule directs courts to suppress evidence obtained through "an unlawful, warrantless arrest" where "the link between the evidence and the unlawful conduct is not too attenuated." *Lopez-Mendoza*, 468 U.S. at 1040–41. "[T]he exclusionary rule is not an individual right." *Herring v. United States*, 555 U.S. 135, 141 (2009). Rather, "[t]he rule's sole purpose . . . is to deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 236–37 (2011). Thus, the rule "applies only where it results in appreciable deterrence" and where "the benefits of deterrence . . . outweigh the costs." *Herring*, 555 U.S. at 141 (internal quotation marks and citation omitted); *see also Lopez-Mendoza*, 468 U.S. at 1046 (noting that application of the exclusionary rule is not justified where it fails "to provide significant, much less substantial, additional deterrence" (internal quotation marks and citation omitted)).

In *Lopez-Mendoza*, the Supreme Court held that the "balance between costs and benefits comes out against applying the exclusionary rule in civil deportation hearings" to

---

[2] Where a BIA decision incorporates "some part of the IJ's opinion as part of the BIA's final order," but also contains the BIA's own reasoning, we review the decisions of both the BIA and IJ. *Martinez v. Holder*, 740 F.3d 902, 908 & n.1 (4th Cir. 2014). We review the IJ and BIA's legal determinations *de novo*. *See id.* at 909. "[A]dministrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

information obtained by INS agents.[3]  468 U.S. at 1050.  The Court acknowledged that applying the exclusionary rule to civil deportation proceedings could deter unlawful police actions.  For example, the Court reasoned that since "only a very small percentage of arrests of aliens . . . lead to criminal prosecutions," in the immigration context, an officer's "primary objective . . . will be to use evidence in the civil deportation proceeding."  *Id.* at 1042–43.  In contrast, where an officer's "primary objective" is to obtain evidence for use in a criminal proceeding, suppressing that evidence in a civil proceeding is less of a deterrent.  *See id.*

The Court found, however, that "other factors significantly reduce the likely deterrent value of the exclusionary rule in a civil deportation proceeding."  *Id.* at 1043.  First, in civil deportation proceedings, the government need only establish identity and alienage.  But courts cannot suppress identity, and it may be possible to prove alienage "using evidence gathered independently of, or sufficiently attenuated from, the original arrest."  *Id.*  Thus, in many cases, "regardless of how the arrest is effected, deportation will still be possible" on the basis of lawfully obtained evidence.  *Id.*

Second, because the vast majority of arrestees agree to voluntary deportation, in the rare instance where an individual challenges the lawfulness of his arrest in a formal deportation proceeding, "the consequences from the point of view of the officer's overall arrest and deportation record will be trivial."  *Id.* at 1044.  Third and "perhaps most

---

[3] The Homeland Security Act of 2002, Pub. L. 107-296, transferred the Immigration and Naturalization Service's ("INS") law enforcement functions to ICE. *See* Dep't of Homeland Sec., 72 Fed. Reg. 20,131, 20,131 (Apr. 17, 2007).

important," because "the INS has its own comprehensive scheme for deterring Fourth Amendment violations by its officers," the exclusionary rule provides little additional deterrent value. *Id.* at 1044–45. Finally, declaratory relief may be available to challenge the validity of repeated INS practices. *Id.* at 1045.

Moreover, the Court found the potential costs of applying the exclusionary rule in civil deportation proceedings to be "both unusual and significant." *Id.* at 1046. Applying the exclusionary rule "would require the courts to close their eyes to ongoing violations of the law." *Id.* It could also disrupt the INS's "deliberately simple deportation hearing system," which "permit[s] the quick resolution of very large numbers of deportation actions." *Id.* at 1048. The Court also emphasized that because of the nature of INS actions, "applying the exclusionary rule to deportation proceedings might well result in the suppression of large amounts of information that had been obtained entirely lawfully." *Id.*

A majority of the Supreme Court therefore held that, on balance, the costs of "applying the exclusionary rule in civil deportation hearings" to information obtained by INS agents outweighed the rule's potential benefits. *Id.* at 1050. A plurality limited the scope of this holding, however, by reserving judgment about cases that presented "egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained." *Id.* at 1050–51 (plurality opinion).

In *Yanez-Marquez*, we applied *Lopez-Mendoza* to hold that "the exclusionary rule applies in removal proceedings to *egregious* violations of the Fourth Amendment." 789

9

F.3d at 450 (emphasis added); *see also Kandamar v. Gonzales*, 464 F.3d 65, 70 (1st Cir. 2006); *Almeida-Amaral v. Gonzales*, 461 F.3d 231, 235 (2d Cir. 2006); *Oliva-Ramos v. Att'y Gen.*, 694 F.3d 259, 274–75 (3d Cir. 2012); *Gonzalez-Rivera v. INS*, 22 F.3d 1441, 1448–49 (9th Cir. 1994). In so holding, we noted that because the four dissenting Justices believed that the exclusionary rule should apply to *all* civil removal proceedings, "a total of eight justices in *Lopez-Mendoza* seem to have agreed that the exclusionary rule should apply in removal proceedings in some form." *Yanez-Marquez*, 789 F.3d at 449 (citing *Lopez-Mendoza*, 468 U.S. at 1051–61).

With these legal principles in mind, we turn to the case at hand.

III.

We first consider whether, as Sanchez and his Amici (collectively "the Challengers") contend, this case requires us to "apply the exclusionary rule in full force" rather than the narrower "egregious violation" rule. Pet. Br. at 27, 30; *see* Amici Br. at 9.

We begin, as *Lopez-Mendoza* did, by considering "the likely deterrent value of the [full] exclusionary rule in a civil deportation proceeding." 468 U.S. at 1043. Much of the *Lopez-Mendoza* Court's rationale applies here. For example, evidence concerning an alien's illegal presence in this country remains useful primarily in the *civil* deportation context, but independent evidence is often still available to ascertain alienage. *Id.* at 1042–43.

But some of the safeguards discussed in *Lopez-Mendoza* that "reduce[d] the likely deterrent value of the exclusionary rule" as applied to federal officers do not apply to

10

state and local officers. *Id.* at 1043. There is no "comprehensive scheme for deterring Fourth Amendment violations by" state and local officers, *id.* at 1044–45, as these officers generally do not receive federal immigration training and are not subject to federal regulations limiting their authority. Nor can "declaratory relief against the federal agency effectively address persistent problems with abusive enforcement" by state and local officers. Pet. Br. at 30. Moreover, because "there is no state-law parallel" to a federal civil immigration proceeding, "the *only* proceeding in which immigration-related evidence will be used is a federal proceeding." Amici Br. at 20. We therefore agree with the Challengers that applying the "full" exclusionary rule in civil immigration proceedings to state and local officers would clearly have some deterrent effect.

But we do not agree that the likely additional deterrent value of the "full" exclusionary rule, as opposed to the "egregious violation" rule, is *appreciable* or *substantial* enough to justify its application. *See Herring*, 555 U.S. at 141; *Lopez-Mendoza*, 468 U.S. at 1046. That is so because of the combined effect of the "egregious violation" rule and our recent holding in *Santos v. Frederick County Board of Commissioners*, 725 F.3d 451 (4th Cir. 2013). In *Santos*, we concluded that "absent express direction or authorization by federal statute or federal officials, state and local law enforcement officers may not detain or arrest an individual solely based on known or suspected civil violations of federal immigration law." *Id.* at 465. Thus, *Santos* makes clear that when, absent federal direction or authorization, a state or local officer detains or arrests someone based *solely* on a civil immigration violation, the officer violates that individual's Fourth Amendment right to be free from unreasonable searches and seizures.

11

A stop or seizure based solely on an abuse of an officer's legal authority and without reasonable suspicion of criminal activity will usually be egregious. In some circumstances, more may be required. But because such conduct is likely egregious, its fruits will likely be suppressed in civil immigration proceedings. For that reason, we believe that, post-*Santos*, the "egregious violation" rule can substantially deter state and local officers from illegally enforcing civil immigration laws.

Moreover, even if the Challengers' proposed rule provides some marginal additional deterrence, that does not outweigh its substantial costs. Requiring IJs to apply a different exclusionary rule depending on the circumstances of a given case would disrupt and complicate the "deliberately simple deportation hearing system." *See Lopez-Mendoza*, 468 U.S. at 1048. This is especially true because state and federal officials can cooperate on immigration matters in various ways. For example, 8 U.S.C. § 1357(g)(1) authorizes the Attorney General to grant to specific state or local officers the authority to "perform a function of" a federal "immigration officer" through a formal, written agreement with the state or local agency. But in the absence of such a written agreement, state and local law enforcement agents may still "cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." *Id.* § 1357(g)(10)(B). Under the Challengers' proposed rule, immigration courts would apply the "full" exclusionary rule to state and local officers who merely "cooperate" with ICE under § 1357(g)(10)(B), but would apply the "egregious violation" rule to those authorized by "written agreement" to "carry out" federal immigration functions under § 1357(g)(1).

12

This would undoubtedly burden the deportation hearing system. The Challengers' rule would require IJs to determine the level of authority a given state or local official had to enforce federal immigration law and to decide which test applies where officers with differing authorities jointly execute an immigration action. It is often difficult to define these categories with clarity. *See, e.g.*, *Maldonado v. Holder*, 763 F.3d 155 (2d Cir. 2014) (describing case where local police department with no supplemental authority under § 1357(g)(1) "jointly conduct[ed] a sting operation" with ICE and, although the local officers actually arrested Petitioners, "ICE agents were on the scene" and "took part in their arrests").

In *Lopez-Mendoza*, the Supreme Court worried that "[t]he prospect of even occasional invocation of the exclusionary rule might significantly change and complicate the character of these [INA] proceedings." 468 U.S. at 1048. Similarly, we can only imagine the effect the Challengers' proposed rule might have on our "deliberately simple deportation hearing system." *See id.*

The Supreme Court has "never suggested that the exclusionary rule must apply in every circumstance in which it might provide marginal deterrence." *Herring*, 555 U.S. at 141 (internal quotation marks and citation omitted). Rather, "to the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against its substantial social costs." *Id.* (internal quotation marks and citation omitted). In light of the availability of the "egregious violation" rule here, "there is no convincing indication that application of the [full]

13

exclusionary rule in civil deportation proceedings will contribute materially" to Fourth Amendment protections. *Lopez-Mendoza*, 468 U.S. at 1046.

Rather, as in *Lopez-Mendoza*, the Challengers' proposed rule would impose significant costs, with little added benefit. *See id.* at 1050. We therefore hold that in addition to federal officers, the "egregious violation" exclusionary rule also applies in civil deportation proceedings to state and local officers. We note that no circuit to consider whether the "egregious violation" exclusionary rule applies to state and local officers has reached a contrary conclusion.[4]

IV.

We turn to the question of whether Sanchez has established an "egregious violation" of the Fourth Amendment.

"A petitioner challenging the admissibility of evidence in a civil removal proceeding 'must come forward with proof establishing a *prima facie* case before the [government] will be called on to assume the burden of justifying the manner in which it

---

[4] *See Maldonado*, 763 F.3d at 163 (applying egregiousness standard because, even if ICE had not played a "substantial role" in the arrests executed by local police officers, petitioners "fail[ed] to identify any authority applying the exclusionary rule in removal proceedings absent an egregious constitutional violation"); *Lopez-Gabriel v. Holder*, 653 F.3d 683, 686 (8th Cir. 2011) (expressing "doubt that even an egregious violation by a state officer would justify suppression of evidence in a federal immigration proceeding," but not resolving the required standard since no "egregious violation" occurred); *see also Aguilar-Hernandez v. Att'y Gen.*, 544 F. App'x 67, 69 (3d Cir. 2013) (not considering propriety of standard, but applying egregiousness rule to conduct of state officer); *Martinez-Medina v. Holder*, 673 F.3d 1029, 1033–34 (9th Cir. 2011) (same); *Ghysels-Reals v. Atty. Gen.*, 418 F. App'x 894, 895 (11th Cir. 2011) (same).

14

obtained the evidence'" and demonstrating the admissibility of that evidence. *Yanez-Marquez*, 789 F.3d at 445 (quoting *Matter of Barcenas*, 19 I. & N. Dec. 609, 611 (BIA 1988) (alternation in original)). To establish this *prima facie* case, the moving party must show both that a violation of the Fourth Amendment occurred and that the violation was egregious. *Id.* at 450. A court may address the two prongs in either order. *Id.* at 451. In this case, we need only address the egregiousness prong.

"[A]n *egregious* violation of the Fourth Amendment" is one that either "transgresses notions of fundamental fairness" or "regardless of the violation's unfairness, undermines the probative value of the challenged evidence." *Id.* at 452. Sanchez asserts that the violation of his rights was egregious under the first standard.

To determine whether "a violation of the Fourth Amendment . . . transgresses notions of fundamental fairness," we consider the "totality of the circumstances." *Id.* at 453, 460. This standard allows us to consider "a variety of factors" on "a flexible case-by-case" basis. *Id.* at 460. These include, but are not limited to:

> (1) whether the Fourth Amendment violation was intentional; (2) whether the violation was unreasonable in addition to being illegal; (3) whether there were threats, coercion, physical abuse, promises, or an unreasonable show of force by the law enforcement officers; (4) whether there was no articulable suspicion for the search or seizure whatsoever; (5) where, when, and how the search, seizure or questioning took place; (6) whether the search, seizure, or questioning was particularly lengthy; (7) whether the law enforcement officers procured an arrest or search warrant; (8) any unique characteristics of the alien involved; and (9) whether the violation was based on racial considerations.

*Id.* at 460–61. We consider the totality of the circumstances and therefore do not discuss every factor; rather, we focus only on those considerations that are determinative in the case before us.

First, Sanchez suggests that because Officer Acker lacked the legal authority to enforce civil immigration violations, his actions were *per se* egregious. But at the time of the 2009 seizure at issue here, we had not yet issued our 2013 decision in *Santos* holding conduct like Officer Acker's illegal. *See Santos*, 725 F.3d at 465–66.

Sanchez responds, however, that "the state of circuit law [is] irrelevant" because Officer Acker admitted that he "*knew* he did not have authority to enforce federal civil immigration law." Pet. Reply Br. at 15. This argument rests on a mischaracterization of Officer Acker's testimony. Before the IJ, Sanchez's counsel asked Officer Acker, "do you have any legal authority to enforce Federal civil Immigration violations," to which he replied, "No, ma'am, that's why we *detain* them." Officer Acker also explained, consistent with his incident report, "that Mr. Sanchez was *detained*, not arrested." Thus, Officer Acker apparently believed that he could not lawfully *arrest* Sanchez but could lawfully *detain* Sanchez, and that his actions accorded with this restriction. Of course, in *Santos* we clarified that "absent express direction or authorization by federal statute or federal officials, state and local law enforcement officers may not *detain or arrest* an individual solely based on known or suspected civil violations of federal immigration law." 725 F.3d at 465 (emphasis added). But that was not the law at the time, and

Sanchez offers no evidence that Officer Acker *knew* that his decision to *detain* Sanchez exceeded his lawful authority. Accordingly, we reject Sanchez's argument on this point.[5]

Nor are we persuaded by Sanchez's arguments that Officer Acker lacked "any reasonable suspicion of any . . . wrongdoing" but was instead motivated by "the fact that the men were Latino." *See* Pet. Br. at 36. These two inquiries are intertwined because we recognize, consistent with the precedent of our sister circuits and the BIA, that a stop based *solely* on race or ethnicity is *per se* egregious.[6] In other words, since race or ethnicity cannot provide reasonable suspicion for a stop or seizure, where an officer relies *only* on race or ethnicity, he necessarily lacks reasonable suspicion for his actions. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 885–86 (1975) (finding that officers lacked reasonable suspicion for a stop where they "relied on a single factor": "the apparent Mexican ancestry" of the persons stopped).

---

[5] Notwithstanding Sanchez's contention to the contrary, we also agree with the IJ and BIA that, in this civil context, his seizure was not "particularly lengthy" in light of then-prevailing law. *Yanez-Marquez*, 789 F.3d at 460. Sanchez remained in MdTAP custody for a total of 3.5 hours. Given ICE's own five-hour timeline in this case, *see supra*, n.1, this does not seem especially lengthy.

[6] *See Almeida-Amaral*, 461 F.3d at 237 ("[W]ere there evidence that the stop was based on race, the violation would be egregious, and the exclusionary rule would apply."); *Orhorhaghe v. INS*, 38 F.3d 488, 503 (9th Cir. 1994) (explaining that "a race-based investigatory stop constitute[s] an egregious violation"); *see also Matter of Toro*, 17 I. & N. Dec. 340, 340, 343–44 (BIA 1980) (suggesting that a stop based "solely" on the fact that the individual "appeared to be of Hispanic descent" would be egregious if done in bad faith). The logic of these holdings stems from *United States v. Brignoni-Ponce*, 422 U.S. 873, 884–87 (1975), which held that the Fourth Amendment "forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens," and that reliance on only race or ethnicity does not constitute reasonable grounds to believe the individual in question is an alien.

17

Sanchez did not establish that Office Acker acted *solely* on the basis of race or ethnicity. When Officer Acker stopped Badillo, the Officer saw that the Nissan had exposed ignition wiring and lacked a steering column, common indicators of a stolen vehicle. The IJ found that, as a result, Officer Acker had reason to "suspect[] ongoing criminal activity," which "naturally" placed him on "higher alert." When Sanchez arrived, he parked the Acura twenty to thirty feet in front of the Nissan and remained inside the Acura with the engine running for five minutes. The IJ credited Officer Acker's testimony that this was "contrary to the way individuals typically act when picking up a friend at the scene of a traffic stop." Although the IJ did not make a specific finding on this point, the Officer also testified that the Acura "had extremely dark tinted windows." Combined, these facts led Officer Acker to conclude that the vehicle's occupants were acting in a "suspicious" manner and were perhaps involved in illegal activity. Given these facts, we find no error in the IJ's conclusion that Officer Acker did not question Sanchez based on race or ethnicity alone.[7]

Of course, even where an officer can articulate other reasonable bases for his actions, a factfinder still considers whether, under the totality of the circumstances inquiry, race or ethnicity motivated the officer's actions. Here, however, the IJ was "not persuaded that racial profiling motivated the MdTAP officers." Sanchez contends that in so finding, the IJ erred. He notes that Officer Acker even testified before the IJ that he

---

[7] We note that Sanchez was not "seized" within the meaning of the Fourth Amendment until Acker asked for the car keys and directed Sanchez to step out of the car. Until then of course, Acker was free to ask questions and Sanchez was free not to answer.

considered "the fact that the men were speaking Spanish" "a 'real problem.'" Pet. Reply Br. at 12. Action assertedly based on proficiency in Spanish may well be a proxy for discrimination against Latinos. *See Hernandez v. New York*, 500 U.S. 352, 371 (1991) (plurality opinion). But Officer Acker's testimony reflects that he considered the use of Spanish "a real problem" because *he* was not fluent in Spanish. Thus, Officer Acker had to call for a Spanish-speaking officer to join him on the scene. Although Sanchez cites to other record evidence which, if true, might offer some support for a contrary holding,[8] the record simply does not lead us to conclude that "any reasonable adjudicator *would* be compelled" to so hold. *See* 8 U.S.C. § 1252(b)(4)(B) (emphasis added).

Sanchez also maintains that the MdTAP officers used threats, coercion, and abuse to obtain his admission. The IJ and BIA found that, at most, Officer Acker's questioning was "aggressive," but that the MdTAP officers "showed no indication of threatening or violent behavior" such that Sanchez lacked "the option to not answer any questions regarding his immigration status."

Again, Sanchez cannot meet the high standard required to overcome this factual finding. Although Sanchez stated that when Officer Acker repeatedly asked whether the three men were "legal or illegal," he "felt pressured," "intimidated," and "frightened,"

_____

[8] The IJ only credited one such statement: that after Officer Acker asked Sanchez whether he was "illegal or legal," he stated that Sanchez "was illegal for sure." The IJ did not make specific findings with respect to the Officer's other purported statements. Those include, for example, Sanchez's allegation that Officer Acker told Sanchez, "You don't have permission to work in this country and you are taking jobs from other people." If true, this statement is certainly troublesome. But the only record evidence of this statement is *Tenorio*'s affidavit. Sanchez, the person to whom Officer Acker allegedly made this comment, did not mention it in his affidavit or his testimony.

19

Sanchez's passengers did not maintain that Officer Acker coerced or threatened them. Moreover, Officer Acker characterized his tone as "authoritative" rather than "aggressive." He explained that he tended to speak "a little louder" when on "the side of the highway," because passing vehicles impair his hearing and that it can sometimes "seem to a person inside a vehicle that you're yelling." Based on all of this testimony, a reasonable factfinder need not, but certainly could have, concluded that the MdTAP officers did not use coercion, threats, or force.[9]

V.

At its very essence, "[s]omething egregious is by nature extreme, rare, and obvious." *Yanez-Marquez*, 789 F.3d at 457 (quoting *Maldonado*, 763 F.3d at 165) (internal quotation marks omitted). "Thus, to stay faithful to the dictates of the Supreme Court, it follows that an alien's evidentiary proffer concerning egregiousness must be high, otherwise" courts risk undermining "the very heart of" *Lopez-Mendoza*. *Id.* at 459.

Consider *Rochin v. California*, 342 U.S. 165 (1952). There, three sheriffs forcibly entered a home, saw Rochin swallow capsules that they believed contained a controlled

---

[9] Because we hold that Sanchez failed to demonstrate that he was coerced, threatened, or forced to make these statements, we similarly affirm the IJ's finding that admitting the Form I–213 did not violate Sanchez's right to due process. To succeed on his due process claim, Sanchez had to establish "that a defect in the proceeding rendered it fundamentally unfair." *Amin v. Mukasey*, 535 F.3d 243, 256 (4th Cir. 2008). Since Sanchez failed to show that the Government obtained his statements in a "fundamentally unfair" manner — *i.e.*, as a result of "coercion, duress, or improper action" — he has not satisfied this burden. *See Yanez-Marquez*, 789 F.3d at 473 (internal quotation marks and citation omitted).

substance, handcuffed him, took him to a hospital, and ordered a doctor to force-feed him an emetic solution to produce vomiting to recover the capsules. *Id.* at 166. The *Lopez-Mendoza* plurality suggested that conduct was egregious. *See* 468 U.S. at 1050–51 (plurality opinion).

In contrast, the plurality did not believe the conduct in *Lopez-Mendoza* itself rose to that level. This was so even though in that case, officers arrested an alien at his place of employment during a warrantless, nonconsensual raid; transported him to the county jail; and questioned him — all without warning him of his right to remain silent. 468 U.S. at 1036–37 (majority opinion); *see id.* at 1050–51 (plurality opinion).

Nor did we find the conduct in *Yanez-Marquez* egregious. There, ICE agents charged with executing a facially valid search warrant of the petitioner's home broke down her bedroom door, questioned her about her identity for five to ten minutes, and "ripp[ed] apart" her house over several hours. 789 F.3d at 439–41. But the ICE agents did not threaten, coerce or abuse the petitioner; the questioning was not lengthy; the agents were not racially motivated; a circuit split existed on the question of whether a daytime warrant authorized a nighttime search; and the agents had a valid search warrant. *Id.* at 469–70. For these reasons, we held the unlawful conduct not egregious, even though it occurred in a home and at night — two circumstances in which privacy interests are typically strongest. *See id.* at 465, 472.

The sheriffs' conduct in *Rochin* was quite extreme, and we do not think that a violation must be "equally flagrant" to qualify as "egregious." *See Cotzojay v. Holder*, 725 F.3d 172, 181 (2d Cir. 2013). But because the Fourth Amendment generally protects

21

against "unreasonable" conduct, "an egregious violation must surely be something more than unreasonable." *Id.* at 182. Given that neither *Lopez-Mendoza* nor *Yanez-Marquez* met this standard, we cannot hold that the facts in this case compel a different result.

In light of the demanding standard, we must conclude that Sanchez has not carried his burden of proving a *prima facie* case of egregiousness.

## VI.

For the foregoing reasons, the petition for review is

*DENIED.*