**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 18-1520 and 18-1521
_____

ERICK GEOVANY YOC-US,

Petitioner in case number 18-1520

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA,

Respondent


LUIS CALEL ESPANTZAY,

Petitioner in case number 18-1521

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA,

Respondent

On Petition for Review of an Order of the
Board of Immigration Appeals
(BIA-1 : A213-090-679 and BIA-1 : A213-090-683)
Immigration Judge:  Honorable Walter A. Durling


Argued on November 7, 2018

(Opinion filed: July 31, 2019)

Before:  AMBRO, SCIRICA and RENDELL, <u>Circuit Judges</u>
Joanna J. Cline, Esquire **(Argued)**
Anthony C. Vale, Esquire
Andrew R. Rogoff, Esquire
Pepper Hamilton
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA 19103

                        Counsel for Petitioners


Jennifer A. Bowen, Esquire
OIL
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

Dana M. Camilleri, Esquire **(Argued)**
United States Department of Justice
Office of Immigration Litigation
450 5th Street, N.W.
Washington, DC 20001

                              Counsel for Respondent


David R. Fine, Esquire
K&L Gates
17 North Second Street
18th Floor
Harrisburg, PA 17101

                              Counsel Amicus-petitioner

─────────

O P I N I O N

─────────

**RENDELL**, Circuit Judge:

Early one morning, Petitioners Erick Geovany Yoc-Us and Luis Calel-Espantzay were traveling in a van that was stopped for speeding by a Pennsylvania state trooper. During the course of the stop, the trooper discovered that Petitioners were undocumented aliens. The trooper detained them and called Immigration and Customs Enforcement ("ICE"), who

interviewed and fingerprinted Petitioners and took them into custody. In the civil removal proceedings that followed, Petitioners argued that the stop violated the Fourth Amendment and that the evidence of their alienage should be suppressed. The Immigration Judge ("IJ") and the Board of Immigration Appeals ("BIA") were unpersuaded. While the Supreme Court has held that the Fourth Amendment does not require suppression of evidence in civil removal proceedings where the purportedly offending conduct by federal agents was neither egregious nor widespread, this case presents a different context, namely, a state trooper's conduct rather than that of a federal officer. Accordingly, we must consider whether this difference leads to a different result.

## I.

### A.

Petitioners are undocumented aliens from Guatemala who have lived and worked in New York since 2008. They were traveling in a van with eight other men, returning to New York from Georgia. According to declarations submitted by Petitioners and other passengers, Pennsylvania State Trooper Luke C. Macke pulled the van over for speeding between 7:40 and 8:00 in the morning. Petitioners were not driving the van when this happened and were instead asleep in the back of the van. When Macke approached the driver of the vehicle, he asked for his license and registration. Petitioners allege that the driver did not have his license with him, but he gave Macke his social security number and offered to call his wife to get his driver's license number. The owner of the van, who was seated in the

4

front passenger seat, gave Macke his own license and registration.

Petitioners allege that "[i]nstead of going back to his vehicle to check [either the van owner's or the driver's] information . . . [,] [Macke] then went to the side passenger door of the van, opened the door and said [to the eight passengers in the back], 'let me see your immigration papers, work permit, visa, passport and ID.'" Calel-Espantzay A. 211. Petitioners claim that they did not have any documents to give him, and their declarations do not indicate that they verbally offered him any information. Contrary to this account, however, the Records of Deportable/Inadmissible Alien ("Forms I-213") produced by the Government purport that, in response to Macke's inquiry, the Petitioners admitted that they were citizens of another country. According to the Forms I-213, Macke contacted ICE at approximately 8:30 a.m. and "stated that he encountered nine individuals during a traffic stop who claimed to be citizens of; [sic] Guatemala, Mexico, El Salvador and Ecuador." *Id.* at 245. Macke issued citations to the driver of the car at 8:57 a.m.[1] *Id.* at 177–78.

Petitioners allege that Macke ordered them to drive the van to a nearby rest stop and, once there, positioned his own car so that Petitioners' van could not be moved. They claim that he ordered them to turn off the van and remain in it and that "[h]e then began to interrogate [them] about [their] immigration status," again "asking to see [their] work permit[s], passports, visas and social security card[s]." *Id.* at 211. Between the time they reached the rest stop and the time ICE agents arrived, Petitioners allege that Macke would not

---

[1] The citations were issued for speeding and for operating a vehicle with a suspended or revoked license.

allow them to leave the van to use the bathroom, would not allow them food or water, and would not let them turn the air-conditioning on in the van even though the weather was "humid." *Id.* at 211–12. They state that they could not leave and that they felt as though they had to answer his questions. They also "d[id] not know why [Macke] kept [them] there except for the fact that [they] all look Hispanic." *Id.* at 212.

According to the Forms I-213, ICE agents arrived at approximately 9:30 a.m., between an hour and a half and two hours after the alleged time of the initial stop. The ICE agents conducted interviews of Petitioners and other passengers and fingerprinted them. The Government's evidence asserts that all "freely stated that they were not citizens of the United States[,] had illegally entered the United States . . . [, and] were not in possession of any immigration document that would allow them to remain the United States lawfully." *Id.* at 245. They were then handcuffed and transported to an immigration office, where they remained for approximately three hours, until they were moved to a local county prison.

B.

The Department of Homeland Security ("DHS") served Petitioners with a Notice to Appear Form, alleging that they were subject to removal pursuant to 8 U.S.C. § 1182(a)(6)(A)(i). Petitioners moved to suppress any evidence of their alienage obtained as a result of the stop, arguing that it had been discovered through a violation of their Fourth Amendment rights. Because the Government would not be able to meet its burden of proving alienage without this

6

evidence, Petitioners also moved to terminate the removal proceedings.

Before the scheduled removal hearing was held, the IJ denied Petitioners' motion and declined their request for an evidentiary hearing. Citing *Lopez-Gabriel v. Holder*, 653 F.3d 683 (8th Cir. 2011), the IJ concluded that the exclusionary rule does not apply to intersovereign situations where a violation was committed by a sovereign other than the one involved in the civil proceeding. The IJ also credited the Government's evidence and found that Petitioners' "complaint against the ICE officers lacks any corroborating evidence" and only amounts to "unsubstantiated allegations." Yoc-Us A. 135. The IJ discredited Petitioners' account that Macke stopped them because of their Hispanic appearance, finding that their claim was "refuted by evidence which shows that their vehicle was stopped for excessive speed." *Id.* Finally, with regard to Macke's alleged misconduct, the IJ concluded that the Immigration Court "lacks authority to provide any remedy for a separate sovereign's misconduct." *Id.* In a subsequent decision, the IJ ordered Petitioners removed from the United States to Guatemala.

A single-member panel of the BIA affirmed the IJ's ruling in substantially identical opinions for each Petitioner. Citing *INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984), the BIA stated that the Fourth Amendment exclusionary rule only applies to removal proceedings where "there are egregious Fourth Amendment violations that transgress Fifth Amendment notions of fundamental fairness, undermining the probative value of the evidence." *Id.* at 4; Calel-Espantzay A. 3. The BIA "discerned no clear error" in the IJ's findings. Yoc-Us A. 3; Calel-Espantzay A. 2. It agreed with the IJ that Macke conducted a lawful stop and that Petitioners failed to

7

show that Macke or the ICE agents engaged in egregious conduct. Because it found that Petitioners did not establish a prima facie case for suppression, the BIA concluded that an evidentiary hearing was unnecessary. Lastly, the BIA rejected Petitioners' claim that this type of violation was "widespread," finding that they failed to present any supporting evidence. This petition for review followed.

## II.

The BIA had jurisdiction to review the IJ's order of removal and order denying Petitioners' motion for suppression and termination pursuant to 8 C.F.R. § 1003.1(b)(3). We have jurisdiction under 8 U.S.C. § 1252(a)(1).

Because the BIA issued its own opinion, we review its decision rather than that of the IJ. *Moreno v. Att'y Gen.*, 887 F.3d 160, 163 (3d Cir. 2018) (citation omitted). However, to the extent that the BIA "deferred to or adopted" the IJ's reasoning, we evaluate the decision of the IJ. *Cadapan v. Att'y Gen.*, 749 F.3d 157, 159 (3d Cir. 2014). We review questions of law *de novo*, subject to the principles of deference articulated in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Id.* We review factual findings "to ensure that they are supported by substantial evidence from the record considered as a whole, and we will reverse based on a factual error only if any reasonable fact-finder would be 'compelled to conclude otherwise.'" *Huang v. Att'y Gen.*, 620 F.3d 372, 379 (3d Cir. 2010) (citing *Espinosa–Cortez v. Att'y Gen.*, 607 F.3d 101, 106 (3d Cir. 2010) and quoting 8 U.S.C. § 1252(b)(4)(B)).

## III.

Petitioners urge that their motion to suppress should have been granted based on the exclusionary rule. They argue that the exclusionary rule should apply when the offending conduct was committed by state or local law enforcement, rather than federal agents. However, even if we do not agree that the exclusionary rule should apply here, they urge that the evidence should still be suppressed pursuant to our holding in *Oliva-Ramos v. Attorney General*, 694 F.3d 259 (3d Cir. 2012), as the fruit of an egregious or widespread Fourth Amendment violation. Alternatively, Petitioners contend that they should have been entitled to an evidentiary hearing on their motion and ask us to remand this matter to the IJ to conduct such a hearing.

## A.

As a threshold matter, we consider whether Petitioners made a prima facie showing that their detention violated the Fourth Amendment and that the evidence they seek to suppress was the fruit of that constitutional violation. Even though Petitioners are not United States citizens, the relevant Fourth and Fourteenth Amendment rights apply to them. *Wong Wing v. United States*, 163 U.S. 228, 238 (1896).

The constitutionality of a seizure that is not an arrest depends upon "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Terry v. Ohio*, 392 U.S. 1, 19 (1968). "[A] search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope," the latter of which "must be strictly tied to and justified by the

9

circumstances which rendered its initiation permissible." *Id.* at 18–19 (citations and internal quotation marks omitted). Therefore, in determining reasonableness, we consider "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 20.

In the context of traffic stops, the Supreme Court has made clear that "the tolerable duration [of the stop] is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (citations omitted). "A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Id.* at 1612 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)) (alterations in original) (holding that a seven or eight minute extension of a traffic stop to conduct a dog sniff is unreasonable if the officer did not have reasonable suspicion of criminal activity). "To prolong a stop beyond that point, the officer must have acquired reasonable suspicion during the mission to justify further investigation." *United States v. Clark*, 902 F.3d 404, 410 (3d Cir. 2018) (citing *Rodriguez*, 135 S. Ct. at 1615). With regard to what questions an officer may ask, the Supreme Court has stated that "inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).

A state or local officer's conduct during a stop is further limited in the immigration context. In *Arizona v. United States*, the Supreme Court raised two concerns with "[d]etaining individuals solely to verify their immigration status." 567 U.S. 387, 413 (2012). First, because "it is not a crime for a removable alien to remain present in the United States," *id.* at 407 (citation omitted), "the usual predicate for an arrest is absent" where an officer stops someone based on possible removability, *id.*; *see also Sanchez v. Sessions*, 885 F.3d 782, 789 (4th Cir. 2018) ("[W]hen, absent federal direction or authorization, a state or local officer detains or arrests someone based *solely* on a civil immigration violation, the officer violates that individual's Fourth Amendment right to be free from unreasonable searches and seizures." (emphasis in original)); *Melendres v. Arpaio*, 695 F.3d 990, 1000 (9th Cir. 2012) ("[T]he Fourth Amendment does not permit a stop or detention based solely on unlawful presence."); *Almeida-Amaral v. Gonzales*, 461 F.3d 231, 236 (2d Cir. 2006) (holding that the petitioner's Fourth Amendment rights were violated where the arresting officer did not have a valid justification for the stop). Even if an initial stop is lawful, "delay[ing] the release of some detainees for no reason other than to verify their immigration status" would "raise constitutional concerns." *Arizona v. United States*, 567 U.S. at 413 (citing *Arizona v. Johnson*, 555 U.S. at 333). Second, detention based only on removability "would disrupt the federal framework" established by Congress. *Id.* "Congress has put in place a system in which state officers may not make warrantless arrests of aliens based on possible removability except in specific, limited circumstances." *Id.* at 410. For example, federal law allows the Attorney General to enter into formal agreements with state or local governments that grant the authority to certain

11

officers to perform the tasks of federal immigration officers. *Id.* at 408–09 (citations omitted). Absent such authorization, local officers are discouraged from involving themselves in immigration matters. *See id.* at 407 (describing the usual process by which federal officials initiate removal proceedings).

This, however, does not bar law enforcement officers from ever inquiring into an individual's immigration status. In *Muehler v. Mena*, the occupant of a home was detained while the police executed a search. 544 U.S. 93, 95 (2005). During that time, a federal immigration officer asked the occupant for her immigration documentation, even though the officer did not have an independent reasonable suspicion to question her about it. *Id.* at 96. The Supreme Court held that this did not violate her Fourth Amendment rights because "the Court of Appeals did not find that the questioning extended the time [she] was detained." *Id.* at 101. Therefore, questioning about an individual's immigration status does not violate the Fourth Amendment where the initial seizure of the individual is lawful and the questioning does not prolong the seizure. However, officers may not stop an individual only to inquire about their immigration status, nor may they extend a stop for such an inquiry. *See Rajah v. Mukasey*, 544 F.3d 427, 441 (2d Cir. 2008) ("The Fourth Amendment does provide protection against random or gratuitous questioning related to an individual's immigration status.").

With this background in mind, we turn to the facts of this case. Although Macke was justified in initially stopping the van for speeding, the record supports Petitioners' allegations that their Fourth Amendment rights were violated when Macke unreasonably extended the stop to investigate

12

their immigration status. The declarations submitted on their behalf allege that Macke stopped the van between 7:40 and 8:00 a.m. The Forms I-213 state that he contacted ICE around 8:30 a.m. The traffic citations were issued at 8:57 a.m., Petitioners were sent to the rest area, and ICE agents arrived about thirty minutes later. Because Macke contacted ICE before the citations were issued, at least some of the time between the initial stop and the issuance of the citations was spent interrogating the passengers in the back of the van. Moreover, Petitioners' and other passengers' thirty-three minute detention after the issuance of the citations—which marked the end of "the seizure's mission"—and before ICE's arrival extended "beyond the time reasonably required to complete the mission of issuing a ticket for the violation." *Rodriguez*, 135 S. Ct. at 1612, 1614 (citations and internal quotation marks omitted). The Government does not allege that Macke had reasonable suspicion that any of the passengers were engaged in any criminal activity or that there were any safety concerns to address. Furthermore, Macke lacked the authority to enforce civil immigration law. *See* U.S. Immigration and Customs Enforcement, *Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act* (last updated Aug 10, 2018), https://www.ice.gov/287g (showing that Pennsylvania has no agreement with the federal government that would allow state agents to perform the functions of immigration officials). Therefore, Petitioners made a prima facie showing that the extension of the stop to investigate their status was unreasonable and in violation of the Fourth Amendment.

13

B.

We next determine whether the exclusionary rule applies to suppress the evidence gathered as a result of the violation so that it should not have been used in Petitioners' civil removal proceedings. The exclusionary rule "bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Davis v. United States*, 564 U.S. 229, 232 (2011). Because the "sole purpose" of the rule "is to deter future Fourth Amendment violations," the rule is only applied in "situations in which this purpose is thought most efficaciously served." *Id.* at 236–37 (citations and internal quotation marks omitted). Initially, application of the rule was limited to federal officers in federal criminal proceedings. *See United States v. Janis*, 428 U.S. 433, 443–44 (1976). However, the exclusionary rule has since been extended to state officers and state criminal proceedings. *See Elkins v. United States*, 364 U.S. 206, 223 (1960); *Mapp v. Ohio*, 367 U.S. 643, 654 (1961). Therefore, it is applicable in all criminal proceedings against federal, state, and local law enforcement. *See Janis*, 428 U.S. at 445–47.

The issue before us is the extent to which the exclusionary rule should apply in civil removal proceedings where a state or local law enforcement officer is accused of violating a petitioner's Fourth Amendment rights. The Supreme Court first considered an analogous issue in *United States v. Janis*. *See id.* at 447. There, pursuant to a search warrant, local law enforcement discovered evidence that the plaintiff had violated gambling laws. 428 U.S. at 434–36. In the ensuing criminal proceeding, the warrant was held to be invalid, and the evidence against the plaintiff was suppressed pursuant to the exclusionary rule. *Id.* at 437–38. The

14

plaintiff then initiated a civil tax proceeding, seeking a refund for the assessment made against him by the Internal Revenue Service based on his winnings from his illicit gambling activities, and moved to suppress the same evidence that had been seized pursuant to the invalid warrant. *Id.* at 438.

In considering whether the exclusionary rule also applied in the civil tax proceeding, the Supreme Court weighed the deterrent effect of the rule in such proceedings against the social costs imposed by applying it there. *Id.* at 447–60. As to deterrence, the Court first noted that state law enforcement officers were already "punished" by application of the exclusionary rule in the criminal proceedings. *Id.* at 448 (internal quotation marks omitted). It reasoned that any additional deterrence provided by application of the rule in civil proceedings was marginal, and the extreme social costs of applying the rule in those settings—namely, "the societal interest in law enforcement by its proscription of what concededly is relevant evidence"—outweighed the deterrent effect. *Id.* at 448–49, 453–54. Additionally, the Court considered that the federal civil proceeding involved the enforcement of the law of a sovereign other than the one involved in the state criminal proceeding, stating that "the deterrent effect of the exclusion of relevant evidence is highly attenuated when the 'punishment' imposed upon the offending criminal enforcement officer is the removal of that evidence from a civil suit by or against a different sovereign." *Id.* at 457–58. It continued:

> This attenuation, coupled with the existing deterrence effected by the denial of use of the evidence by either sovereign in the criminal

15

trials with which the searching officer is concerned, creates a situation in which the imposition of the exclusionary rule sought in this case is unlikely to provide significant, much less substantial, additional deterrence. It falls outside the offending officer's zone of primary interest.

*Id.* at 458. Therefore, the Court held "that the judicially created exclusionary rule should not be extended to forbid the use in the civil proceeding of one sovereign of evidence seized by a criminal law enforcement agent of another sovereign." *Id.* at 460.

The Supreme Court again considered the *Janis* factors of deterrence and social costs in *INS v. Lopez-Mendoza*, where it was urged that the exclusionary rule should apply in civil deportation[2] proceedings when the evidence supporting removal was gathered by federal immigration officers in violation of petitioner-aliens' Fourth Amendment rights. 468 U.S. at 1034, 1041. At the outset, the Court noted the unique nature of deportation proceedings: "A deportation proceeding is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry." *Id.* at 1038.

---

[2] *Lopez-Mendoza* was decided before the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, which replaced the term "deportation" with "removal." *I.N.S. v. St. Cyr*, 533 U.S. 289, 315 (2001). Therefore, the civil proceedings at issue here are no different from those that took place in *Lopez-Mendoza*.

Immigration judges are only able to order deportation, and the government's only burden is showing identity and alienage. *Id.* at 1038–39.

The Court then turned to the likely deterrent effect of applying the exclusionary rule in deportation proceedings. It acknowledged that because federal immigration officers are primarily concerned with using evidence in these specific proceedings, the rule could deter unlawful conduct. *Id.* at 1042–43. However, the Court found that "several other factors significantly reduce the likely deterrent value of the exclusionary rule" in this setting. *Id.* at 1043. First, the person and identity of an individual are not suppressible in the same way as evidence probative of criminal conduct. Thus, the government will be able to meet its burden in some cases where there is "evidence gathered independently of, or sufficiently attenuated from, the original arrest." *Id.* Second, federal immigration officers believe that it is highly unlikely that an individual will challenge the lawfulness of his or her arrest in removal proceedings. *Id.* at 1044. Because the consequences of the rare challenge are "trivial" to the arresting officer, he "is most unlikely to shape his conduct in anticipation of the exclusion of evidence at a formal deportation hearing." *Id.* "Third, and perhaps most important, the INS has its own comprehensive scheme for deterring Fourth Amendment violations by its officers." *Id.* The Court explained that most arrests of undocumented aliens occur during workplace surveys where "[l]arge numbers of illegal aliens are often arrested at one time, and conditions are understandably chaotic." *Id.* "To safeguard the rights of those who are lawfully present at inspected workplaces," the INS created rules limiting agents' ability to stop, interrogate, and arrest. *Id.* at 1044–45. Agents receive training on the

17

Fourth Amendment at the start of their employment and periodically throughout. *Id.* at 1045. Furthermore, the Department of Justice excludes evidence seized "through intentionally unlawful conduct . . . from the proceeding for which it was obtained," and the INS investigates and punishes agents who commit Fourth Amendment violations. *Id.* Although the Court conceded that these rules and practices "cannot guarantee that constitutional violations will not occur," it concluded that they do "reduce the likely deterrent value of the exclusionary rule." *Id.* at 1045. Finally, that value is further "undermined by the availability of alternative remedies for institutional practices by the INS that might violate Fourth Amendment rights." *Id.* When an individual has standing to do so, he or she may challenge INS practices through an action against the agency for declaratory relief. *Id.*

The Court also determined that, on the other side of the equation, "the social costs of applying the exclusionary rule in deportation proceedings are both unusual and significant." *Id.* at 1046. First, application of the rule "in proceedings that are intended not to punish past transgressions but to prevent their continuance or renewal would require the courts to close their eyes to ongoing violations of the law." *Id.* Second, the exclusionary rule "might significantly change and complicate the character of these proceedings," which are "deliberately simple" and "streamlined to permit the quick resolution of very large numbers of deportation actions." *Id.* at 1048. Third, because federal immigration officers are currently not required to "compile elaborate, contemporaneous, written reports detailing the circumstances of every arrest," applying the exclusionary rule to these proceedings could seriously burden these officers by requiring them to do "considerably

18

more." *Id.* at 1049. Finally, because of the "crowded and confused" nature of INS arrests, application of the exclusionary rule might result in the exclusion of evidence that had been obtained lawfully. *Id.*

Based on these factors, the five Justices in the *Lopez-Mendoza* majority agreed that "the Janis balance between costs and benefits comes out against applying the exclusionary rule in civil deportation hearings." *Id.* at 1050. However, a plurality qualified this holding by reserving judgment about cases involving "Fourth Amendment violations by INS officers [that are] widespread" and "egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained." *Id.* at 1050–51. Four Justices dissented, each believing that the exclusionary rule should apply more generally in civil deportation proceedings. *See id.* at 1051–52 (Brennan, J., dissenting); *id.* at 1052–60 (White, J., dissenting); *id.* at 1060 (Marshall, J., dissenting) *id.* at 1060–61 (Stevens, J., dissenting). Therefore, eight of the nine Justices—the four in the plurality and the four dissenting—agreed that the rule could apply in removal proceedings where an egregious or widespread Fourth Amendment violation occurred.

While the plurality of the Supreme Court in *Lopez-Mendoza* did not offer further guidance on the enumerated possible exceptions, in *Oliva-Ramos*, we considered the import of the various opinions in *Lopez-Mendoza* and specifically rejected the BIA's view that the portion of the opinion that set forth the exceptions was *obiter dicta*. *See Oliva-Ramos*, 694 F.3d at 266, 271–72. We stated that "where an alien can establish either of those two

19

circumstances, the plurality opinion can only be read as affirming that the remedy of suppression justifies the social cost." *Id.* at 271–72. We then addressed what might constitute an "egregious" violation of the Fourth Amendment. In determining the standard that should apply, we reviewed the approaches taken by the Ninth and the Second Circuits. *See id.* at 276. The former "considers whether the agents committed the violations deliberately or by conduct a reasonable officer should have known would violate the Constitution." *Id.* (quoting *Orhorhaghe v. INS*, 38 F.3d 488, 493 (9th Cir. 1994)) (internal quotation marks omitted). Alternatively, the Second Circuit held that the exclusionary rule applies "if record evidence established either (a) that an egregious violation that was fundamentally unfair had occurred, or (b) that the violation—regardless of its egregiousness or unfairness—undermined the reliability of the evidence in dispute." *Id.* at 277 (quoting *Almeida-Amaral v. Gonzales*, 461 F.3d 231, 234 (2d Cir. 2006)) (internal quotation marks omitted). That Court elaborated on the first prong, explaining that the focus should be "on the characteristics and severity of the offending conduct." *Id.* at 278. It added that "even where the seizure is not especially severe, it may nevertheless qualify as an egregious violation if the stop was based on race (or some other grossly improper consideration)." *Id.*

Because the Ninth Circuit's approach "would permit conduct that may be objectively reasonable based on directives of [DHS], but nevertheless result in routine invasions of the constitutionally protected privacy rights of individuals," we adopted the Second Circuit's approach "with slight modification." *Id.* We stated that "evidence will be the result of an egregious violation within the meaning of *Lopez-*

*Mendoza*, if the record evidence established either (a) that a constitutional violation that was fundamentally unfair had occurred, or (b) that the violation—regardless of its unfairness—undermined the reliability of evidence in dispute." *Id.* at 278. We explained that the totality of the circumstances should be considered in making this determination and offered a non-exhaustive list of factors for agencies and courts to consider, including, for example, whether the seizure was "based on race or perceived ethnicity." *Id.* at 279. We also stated that "most constitutional violations that are part of a pattern of widespread violations of the Fourth Amendment would also satisfy the test for an egregious violation." *Id.* at 280.

## C.

Here, we must determine the extent to which the exclusionary rule will apply in removal proceedings where a state or local law enforcement officer, rather than a federal immigration officer, is accused of violating a petitioner's Fourth Amendment rights. As noted above, since its holding in *Lopez-Mendoza*, the Supreme Court has expressed reluctance to have state and local officers engage in enforcement of federal immigration laws except to the extent that Congress has expressly allowed. In *Arizona v. United States*, the Court held that three Arizona statutory provisions allowing these officers to enforce certain federal immigration laws were preempted by federal law. 567 U.S. at 392–93, 416. In doing so, the Court expressed concern over "disrupt[ing] the federal framework" put in place by Congress, which specifically provides for state and local officers to play a role in enforcement of certain federal immigration laws if the state or local government has a

21

formal agreement with the federal government. *Id.* at 413; *see also id.* at 410. Although preemption is not at issue in this case, we note that the factual distinction in this case that was not present in *Lopez-Mendoza*—namely, that the conduct of state or local law enforcement is at issue—was central to the Court's ruling in *Arizona v. United States*.

As in *Janis* and *Lopez-Mendoza*, our balancing analysis begins with consideration of the exclusionary rule's likely deterrent effect in removal proceedings where a state or local agent has violated the Fourth Amendment. As in *Lopez-Mendoza*, deterrence is reduced by the fact that the person and identity of an individual are not suppressible in these proceedings. *Lopez-Mendoza*, 468 U.S. at 1043. Therefore, the government will likely be able to meet its burden using independent evidence of alienage in many cases. *Id.* The remainder of the Supreme Court's deterrence analysis in *Lopez-Mendoza*, however, is specific to federal immigration officers and does not lend itself easily to state or local law enforcement. If anything, the comparison might lead to the conclusion that there are fewer deterrents in place for local officials, such that application of the "full" exclusionary rule might be called for. For example, state and local law officers are not trained to enforce the immigration laws, nor are they subject to the INS mechanisms that are in place to deter Fourth Amendment violations. *See id.* at 1042–44; *see also Sanchez*, 885 F.3d at 788. Furthermore, petitioners cannot seek declaratory relief against the federal agency to address the "institutional practices" of state and local officers that violate the Fourth Amendment. *See Lopez-Mendoza*, 468 U.S. at 1045; *Sanchez*, 885 F.3d at 788.

However, state and local officers are already "punished" by the use of the exclusionary rule in criminal proceedings. *See Janis*, 428 U.S. at 448 (internal quotation marks omitted). Therefore, any additional deterrence provided by the rule in the federal immigration setting is marginal. This marginal deterrence is further attenuated by the intersovereign nature of this case, since the application of the exclusionary rule against state and local law enforcement would result in "the removal of . . . evidence from a civil suit by or against a different sovereign." *Id.* at 457–58. Therefore, the "punishment" is "outside the offending officer's zone of primary interest." *Id.* at 457–58 (internal quotation marks omitted); *see also Lopez-Mendoza*, 468 U.S. at 1043 ("[T]he exclusionary rule is likely to be most effective when applied to . . . 'intrasovereign' violations."); *Lopez-Gabriel*, 653 F.3d at 686 (8th Cir. 2011) ("The case for exclusion of evidence is even weaker where the alleged misconduct was committed by an agent of a separate sovereign. If evidence were suppressed in a federal civil immigration proceeding, any deterrent effect on a local police officer would be highly attenuated.").

The Fourth Circuit Court of Appeals recently analyzed the deterrent value when local officials are involved and agreed that applying the "full" exclusionary rule "would clearly have some deterrent effect." *Sanchez*, 885 F.3d at 789. Nonetheless, it did not agree "that the likely additional deterrent value of the 'full' exclusionary rule, as opposed to the 'egregious violation' rule, is *appreciable* or *substantial* enough to justify its application." *Id.* (emphases in original). It reasoned that if an officer "detains or arrests someone based *solely* on a civil immigration violation," i.e., without reasonable suspicion of criminal activity, in abuse of his legal

23

authority, the stop or seizure will "usually be egregious." *Id.* Thus, the Court concluded that use of the "full" exclusionary rule was unnecessary in order to deter unconstitutional conduct. *See id.*

We agree that application of the "full" exclusionary rule in removal proceedings where a Fourth Amendment violation was committed by a state or local law enforcement officer "is unlikely to provide significant, much less substantial, additional deterrence." *Lopez-Mendoza*, 468 U.S. at 1046 (quoting *Janis*, 428 U.S at 458) (internal quotation marks omitted). And, as noted by the Fourth Circuit in *Sanchez*, sufficient additional deterrence can be provided by the two exceptions offered by the plurality of the Supreme Court in *Lopez-Mendoza* and adopted by this Court in *Oliva-Ramos* if egregious or widespread.

On the social costs side of the balance, application of the exclusionary rule to cases where nonfederal law enforcement officials were the relevant actors would undoubtedly lead to the exclusion of relevant evidence, a cost the Supreme Court considered significant in *Janis*. 428 U.S. at 448–49. Additionally, two of the considerations addressed in *Lopez-Mendoza* also apply, at least in part, here. First, application of the exclusionary rule to these proceedings "would require the courts to close their eyes to ongoing violations of the law."[3] 468 U.S. at 1046. In *Lopez-*

---

[3] This social cost is mitigated, however, by the fact that the Supreme Court has more recently held that "it is not a crime for a removable alien to remain present in the United States." *See Arizona v. United States*, 567 U.S. at 407 (citation omitted).

*Mendoza*, the Court noted that it "has never before accepted costs of this character in applying the exclusionary rule," and, where it has considered this type of cost, it "has firmly indicated that the exclusionary rule does not extend this far." *Id.* (citations omitted). Second, the exclusionary rule "might significantly change and complicate" what are otherwise "streamlined" proceedings. *Id.* at 1048. And, as noted by the Fourth Circuit in *Sanchez*, this second cost would be magnified if different rules applied based on the nature of the authorizations that various state and local law enforcement may have to enforce immigration laws. 885 F.3d at 789. If faced with a violation by a state and local officer whose sovereign government has a formal, written agreement with the federal government, immigration courts would apply the rule of *Lopez-Mendoza*. *Id.* However, in the absence of such an agreement, those courts would be tasked with applying a different rule, namely, the "full" exclusionary rule. *Id.*

Therefore, applying the exclusionary rule in these settings would require IJs to determine the level of authority a given state or local official had to enforce federal immigration law and to decide which test applies where officers with different authorities jointly execute an immigration action. It is often difficult to define these categories with clarity.

*Sanchez*, 885 F.3d at 789 (citation omitted). Placing this burden on immigration courts would undoubtedly interrupt these otherwise "deliberately simple" and "streamlined"

25

proceedings. *Lopez-Mendoza*, 468 U.S. at 1048. Because the totality of these costs outweighs any marginal deterrence supplied by the "full" exclusionary rule's application in this setting, we hold that the exclusionary rule is not generally available in removal proceedings where state or local law officers have violated the Fourth Amendment. However, we hold that the *Lopez-Mendoza* exceptions also apply to state and local officers in these proceedings.

D.

With this standard in mind, we turn to the question of whether Petitioners have established an egregious or a widespread Fourth Amendment violation. In removal proceedings, the alien bears the burden of proving a prima facie case that the evidence should be suppressed. *Matter of Tang*, 13 I&N Dec. 691, 692 (BIA 1971). When the alien satisfies his or her burden, the burden then shifts to the Government to "justify[] the manner in which it obtained its evidence." *Id.* An evidentiary hearing is warranted where an alien alleges facts that state a violation of his or her Fourth Amendment rights and shows, through an affidavit, that the violation could be deemed to be egregious or widespread. *See Zuniga-Perez v. Sessions*, 897 F.3d 114, 125 (2d Cir. 2018); *Yanez-Marquez v. Lynch*, 789 F.3d 434, 450 (4th Cir. 2015) ("A petitioner must first provide an affidavit that, taken as true, *could* support a basis for excluding the evidence. If the affidavit is sufficient, the petitioner is entitled to an opportunity to confirm those allegations in an evidentiary hearing." (citations and internal quotation marks omitted) (emphasis in original)); *Maldonado v. Holder*, 763 F.3d 155, 161–61 (2d Cir. 2014) ("Petitioners were required to proffer affidavits based on personal knowledge that, taken as true,

could support suppression. Had their affidavits been sufficient, they would have had an opportunity to confirm those allegations in an evidentiary hearing."); *see also Oliva-Ramos*, 694 F.3d at 275 ("The IJ and the Board should have, but did not first determine whether agents violated Oliva-Ramos's Fourth Amendment rights and second, whether any such violations implicated the Lopez–Mendoza exception for being widespread or egregious.").

1.

Petitioners allege that Macke's conduct was egregious because it was "based on their Hispanic appearance and the fact that they spoke Spanish." Br. for Petitioners at 25. Although they concede that "the initial stop may have been justified because the van in which Petitioners were passengers was allegedly speeding," they argue that the constitutional violation began when Macke questioned and detained them and would not let the van leave after issuing the citations but, instead, ordered that it be driven to the rest area to await the ICE agents. *Id.* at 17.

As noted above, we held in *Oliva-Ramos* that "evidence will be the result of an egregious violation within the meaning of *Lopez-Mendoza*, if the record evidence established either (a) that a constitutional violation that was fundamentally unfair had occurred, or (b) that the violation—regardless of its unfairness—undermined the reliability of evidence in dispute." 694 F.3d at 278. In making this determination, we instructed "courts and agencies [to] adopt a flexible case-by-case approach" and consider the totality of the circumstances. *Id.* at 278–79. We also laid out the following non-exhaustive list of factors that may be

27

considered in this inquiry: "whether [the petitioner] can establish intentional violations of the Fourth Amendment"; "whether the seizure itself was so gross or unreasonable in addition to being without a plausible legal ground, (e.g., when the initial illegal stop is particularly lengthy, there is an unnecessary and menacing show or use of force, etc.)"; "whether improper seizures, illegal entry of homes, or arrests occurred under threats, coercion or physical abuse"; "the extent to which the agents reported to unreasonable shows of force"; and "whether any seizures or arrests were based on race or perceived ethnicity." *Id.* at 279.

We do not agree with the IJ and the BIA that Petitioners failed to allege a potentially egregious Fourth Amendment violation that would warrant an evidentiary hearing. First, as we determined above, Macke's extension of the stop was unreasonable and in violation of the Fourth Amendment. Second, Petitioners' allegations, if true, may show an egregious Fourth Amendment violation that would warrant application of the exclusionary rule because, as noted above, we specifically stated in *Oliva-Ramos* that "whether any seizures or arrests were based on race or perceived ethnicity" was a consideration in determining whether an egregious Fourth Amendment violation had occurred. *Id.* Through their own declarations and the declarations of other passengers, Petitioners claim that Macke detained them and ordered them to travel to the rest area because they "all look Hispanic." *E.g.*, Calel-Espantzay A. 212. Although the Government's Forms I-213 assert that Petitioners "claimed to be" citizens of other countries in their interactions with Macke, *e.g.*, *id.* at 174, the declarations submitted by Petitioners simply state that they "did not have anything to give him" in response to his request for "immigration papers,

28

work permit, visa, passport, and ID," *e.g.*, *id.* at 211 (internal quotation marks omitted).  In fact, Macke's request, as alleged by Petitioners, supports their claim that Macke continued the stop because of the passengers' Hispanic appearance.  His demand for this type of documentation, prior to *any* interaction with the passengers in the rear of the van, shows an assumption on his part that the Petitioners and other passengers were not United States citizens, a conclusion he could have only come to based on their appearance.

The facts alleged by Petitioners, if supported by evidence, could support the conclusion that the illegal extension of the stop was solely "based on race or perceived ethnicity."  *Oliva-Ramos*, 694 F.3d at 279.  Other facts alleged by Petitioners, if true, may also add to the "egregiousness" calculus.  *See id.* at 279 (instructing courts to consider the totality of the circumstances and explaining that the list of enumerated guiding factors is non-exhaustive).  Petitioners aver that they were refused water and food and were not allowed to use the bathroom or turn on the van's air conditioning while they were detained by Macke.  Depending on the actual evidence adduced, these facts could be considered evidence of coercion or use of force as part of the totality of the circumstances test.

Because Petitioners have identified a possible egregious Fourth Amendment violation, we conclude that the IJ erred in not granting their motion for a hearing to provide them with an opportunity to put forth evidence in support of their claim.  However, we take no position as to the merits of that claim.  Instead, we merely conclude that Petitioners should have been allowed to present evidence to support their argument that the misconduct in this case is egregious and

warrants suppression.  Therefore, we will remand to the BIA to remand to the IJ for an evidentiary hearing.

2.

Petitioners also allege that Fourth Amendment violations like the one committed against them by Macke are widespread, thereby warranting suppression in this case. Their only supporting evidence of this—news articles published after the agency proceedings and while this appeal was pending that report on the allegedly "unconstitutional traffic stops by the Pennsylvania state police targeting Hispanic-looking men"—was not before the IJ or the BIA. Petitioners' Reply in Support of Motion at 2.  They have moved to supplement the record on appeal with these articles. However, because our review is limited to "the administrative record on which the order of removal is based," we are barred from reviewing them in the first instance. [4]  8 U.S.C. § 1252(b)(4)(A).  Instead, Petitioners may seek to introduce this evidence on remand at the evidentiary hearing.

IV.

For the reasons discussed above, we will vacate the BIA's February 23, 2018 orders, and we will remand to the BIA with instructions that it grant Petitioners' request for an evidentiary hearing and that it conduct further proceedings consistent with this opinion.

---

[4] Accordingly, we will deny Petitioners' motions to introduce this evidence on appeal.